I concur
Wm. D. James.
It is singular that Judge Gaillard should . have referred solely to the.common law of England for analogies relative to female slaves. That law Is of force among us, only so, far as accords, with our situation and circumstances. “We must, says a writer in the North-Amcrican Review, (October, 18g0, p. 409) borrow from the civil law, the .rules on a subject with which this part of the nation (Massachusetts) has no connexion, *132 but which in another part (the slave-holding statesj is but of too great importance, -to wit, involuntary servitude.”
As to the estimation in which thé civillaw is held in England and America, see Sir Wm. Jones on Bailments. 1 Tuck. Blacks, part 1; Appix. 439; 1 Fonb. 355; 3 Binn. 507; post.
“Suppose a female slave is bequeathed, and she has after-wards a son, who grows up to man's estate, and then testator dies; does the bequest of the mother pass the son? or if a mare be bequeathed, which afterwards has a foal that grows up to a horse, and then testator dies; does the gift of the mare pass also the horse? Surely not. Dictum of Sir Samuel Romilly, in 2 Maddox Rep. 277.
The express mention of manhood in case of the slave, and full maturity (horsehood) in case of the foal, show' what would have been Sir S. R’s opinion as to children and foals. “In q case of doubt-the law of humanity" ought to turn the scale.* By Roane, Just. 4, H. & M. 291. “In re dubia, sententia be-nignior sequenda est.” 3 Poth. ad. Pand.
In both these cases, the issue of slaves are the subject under discussion, by the Virginia judges and by Pothier. Sir Wm. Jones says, the whole civil law must be considered as one system, and taken together. In this way, the two following clauses must be construed: Ancilla cum natrs legata, dum homo in hominis accessione non est, adeo duo legata separata suntA Issue not mere accessories. Dig. Lib. 3 Tit. 8; 3 Pothier 2d Pand, 315.
That is, they are so distinct that, though the ancilla die, the naii may pass under the bequest: for (say the institutes^ “ Si quis ancillas, cum suis natis, legaverit, etiamsi an cilice mortum fuerint,' partus legato cedunt.” (Issue not mere accessories. Vinn 2, 20, 17.
"Causa significat et fat-um h. partum ct partus partum_om-nem denique rei vtilitatem ” Calv. Lexic. Jurid. Causa.
See the case of Ellis, vs. Shell, 4. Desauss. 611, decided before Mdledge & Lamar, (ibid 642.) but wholly overlooked both in that case and in this.
*133 Tn 2 Const. Dec. 65. Chevcs, Just, notices the case of Ellis & Shell (very defectively presented to him) and. says ('inter alia) “The claim of plaintiffs is for the issue of the female slaves, which in general is to be considered as identified with the parents. Ftom the nature oj this property, this principle is generally necessary to the perpetuation of the property, particularly in cases like the present, fee.” — ('case of infants.J
Mr. Che ves (delivering the opinion of the court) seems to have been duly impressed with the want of analogy between cases of slaves, their issue, fee. fee. and cases arising under the common laio of England, where no such property exists. Cases of personal property are, in England, decided in Chancery, or in the Ecclesiastical courts, both of winch make frequent reference to the civil law. IIow highly that law is esteemed there and in the United States also, will be seen from the following authorities. Judge Gaillard must have overlooked them. “The civil law, as a system of jurisprudence, framed by wise men and approved by the experience of ages, znust in every country and in every age furnish principles, which modified and applied as circumstances may require, will greatly contribute to the real interests and welfare of society.” I JPonb. 255.
The lawyers and the people of England have always shown a jealousy both of the principles and practice of the civil law. But by degrees, in cases where the civil law is clearly right, jealousy gives way to good sense and justice.” By Tilghman, ch. just. 3 Binney, 507.
“Our probate and testamentary laws are confessedly no part of the common law, which did not admit of devises.” North Ame. Rev. Oct. 1820.
“The civil law is the repository of all the principles by which national intercourse is regulated.” — Ibid.
The civil law is the origin of the law, mercantile and maritime. It is copious on the subject of contracts, covenants, and other obligations, which are topics of frequent discussion in the commercial world.” — Ibid,
*134 “In questions of rational law, no cause can'be assigned why we should not shorten our own labor, by resorting occasionally to the wisdom of ancient jurists, many of whom were the most ingenious and sagacious of men. What is good sense in one age, must be good sense, all circumstances remaining, in another; and pure unsophisticated r.easdn is tile same in Italy and in England, in the minds of a Papinian and of a Blackstone.” Sir Wm. Jones, Law of Bailments, works, vol. 6, p. 604.
“Justinian’s great work (the Corpus Juris Ciyilis) bears marks unquestionably of great precipitation — but with all its Imperfections, it is a most valuable.mine of judicial knowledge. It gives law at this day -to the greatest part of Europe (he might have added.the French and Spanish settlements throughout the western world) and though few English lawyers dare make such an acknowledgment, it is the true source of nearly all our English laws that are not of feudal origin.” By Sir Wm. Jones. See his Life by Lord Teignmouth, p. 308, 4 to Ed.
“Nous admirqns, tous Ies siecles admireront, la theorie sur les dioses ot sur les contrats, que se trouvent dans Ies recueils de Justinien.” Code civil, de France v. 428.
“The same may be said of the civil law as of the common law (in the courts of the United States, i. e. the Federal courts); the rule of proceeding in which, whenever the written law is slfeiit, áre to be observed in cases of equity, and of admiralty jurisdiction.” Tucker’s Black, vol. 1, p. 1. appen’x.
Having thus shown how far the civil law is entitled to weight, both in the Federal and State Courts of our republic, it cannot be unnecessary-to subjoin the extracts contained in that-law, relative to the point settled by the Court of Equity in the case wherein the judges delivered the .opinions, here reported.
It must be recollected that tlie whole body .of .civil lav/ (digests, code, novels, institutes, Sic.) are to.be, taken as one-system, as Sir Wm. Jones has above-stated. .By. due attention to his recommendation, we shall have no difficulty in reconciling the following passages, the first of which is from the Pan--dects; the last from the Institutes. Taken together they shew *135 that the civil law distinguishes, with exact regard to good sense and the fitness of things, cases wherein the issue of female slaves shall he considered as accessories, or as non-accessories.
“Ancilla cum natis legata, dum homo in hominis acccssionc non est, adeo duo legata separata sunt.” Dig. cited 3 Pothier, ad. Pand. 315.
The above passage was relied on by Mr. King, when consulted by the chancellors upon the applicability of the civil law in fhe-case of Gayle & Cunningham. As there was no mention in that case, of the issue, and as m this extract they are expressly mentioned, it is singular that any stress should have been laid upon this extract. It only says that “if a female slave, with her issue, be bequeathed, the issue, though the. mother die, shall go to the legatee. In a predicament where the maxim partus sequitur ventrón, would have, caused the children to he buried alive, common sense at once refused to consider them as accessories. The doctrine on this head is more fully and intelligibly laid down by the Institutes, and by Vinnius, the commentator on them.
“Si quis ahcillas cum suis natis legavcrit, c-tiams'i anciihs mortuffi fuerint, partus legato cedunt.” Vinn. 2, 20, 17.
Commentabius.— *-Ioc paragrapho et tribus sequentibus docetur quid juris sit, si rei legata;, (vivo testaiore) vel decesserit aliquid, vel accesscnt. Si aliquid decesserit, ita jus cst ut neqne legatum extinguatur nisi quod decessit sit principale, reliqumrj accessorium; ñeque hocres teneatur supplere quod decessit, sed proestatione ejus quod superest, liberatin'. Hoec res quatuor exemplis declaratur — 1 Legati ancillse cum suis natis (the case above stated from the digest;) 2 Servorum ordinariorum cura vicariis: 3 Legati gregis: 4 Legati peculii. Cseterum, ut dixl, ita quod superest legato cedit, si id quoque principaliter legatum sit; non si cut acccssio ejus quod decessit; nana, perempta re prin-cipali, etiam legatum accessionis extinguitur: quod ostenditur hoc § (paragrapho) exemplo legati servi, cum peculio; item fundi, cum instrumento, legati. Si quid accessor it, placet etiam illud legato cedere: cujas rei tria exempla proferentur — legati gregis, cui postea adjecta plura capita; legati ccdium, quibus *136 adjects: columuae & marmora; legati peculii cui deiilde aliquid accessit. Lati autcm hie locus patet. Nam hue ctiam pertinent fructus, usurea,pensiones proediorum,partus, feetus, alluvio, insula in confinio it&ta, et plura alia quee hie n on tangí Justinianus.
(The doctrine of alluvion, and of an'island in confinio nata, is sufficiently known even to English common lawyers; so as to the fictus pccoris. Ill the above passage, the partus ancillarum-is classed with them, and will be governed by the maxim — noscitur ex sociis.)
' “There is no other general rule, in doubts concerning what ought to go along with the thing bequeathed, as its accessory, than first, the intention of the testator; next, the circumstances and usages of the place if there be any — may help us to judge what ought to be accounted accessory and what ought not, 2 Domat, 161, (Lib. iv. Tit. 2) 2 Const. Dec. 95.
“I?i infinitum, quibasque prinvs próxima copulata procedure (are accessory.) Optimum ergo esse ait Pedius, non pro-priam verborum significationem scrutari, sed, in primis, quid testator demonstrare voluerit; deiade, m qua praisumptionc sunt, qui in qnaque regionc commorantur.” — cited, Domal ut supra.
“Nimirum sic in universum jns est, ut cum qurentur quantum sit in legato, id tempus inspiciatur quo dies legati cedit; id est, cum res legata deberi incipit. Proindc, si ante diem legati cedentem, quovis modo aucium fuerit legatum, etiam augmentum illud legatario debelar.” — Vinnius,p 415 (4to ed.)
“An instrumenti instrumentum,.legato instrumento, con-tinetur, queerltur, haec enim quee, rusticorum causa parantur, lanificm, et fullones, et tonsares, et focarice non agri sunt in-strumentum, sed instrumenti (sc. servorum.) Puto igitur con-tineri quee supra enumerata sunt. Uxores quo qua ct infantes eorum credendum est, eadem villa agentes, voluissc testatorem legato contineri. JSraque enim duram separationem injunxisse credendus est.” See Pothier, ad. Pand, val. 3,p. 48.
“Non partus fructuario, aut bonte fidei possessori acquiri debeat. In cceteris partibus juris, in fructu, sive reditu, ant cau- ,? a, etiam partus iporaputantuv,” ’ Vmnius, ii. i. 37, p. 167.
*137 We have already seen that, according to Vinnius, the partus ancillarum was considered as an accession, due (lega-taño,) to the legatee,
■“Exemplum affert Sctevola. Concubinos, inter csetera, his verbis legaverat,” Fundum in Appia (via) cum villirosuo -et contubernali ejus et film, dari volo. Qusesitum est an et nepotes quoque villici et contubernalis ejus testator ad concubi-nam pertinere voluit. Respondit Scasvola nihil proponi cur non deberentur. (There was no reason why they also (the grandchildren — nepotes) should not go. 3 Poth. ad. Pand, 48.
“Pothier adds in a note:” — Htec interpretado vocis “filiis" mbtinet ad dechnandum odium separationis liberorum a matre sua. Regularitur autem filiorum appellatio ad nepotes non porrigitur.” Thus the same motive of humanity that prevented the tenant for life, or other (bona fide) tenant for years, from taking the issue, interfered to prevent the barbarous separation of child and mother, in the case of a legatee of the former, without any mention of the latter. The comprehensive meaning of the word causa, has been shown from Calvin’s Lexicon. It means, says he, omnetn rei utilitatem; and though it shall not be extended to the fmetuarius, &c. shall, in cceteris juris partibus, have full effect; and Vinnius uses the word causa in that part of his commentary wherein he is considering how ' much a legacy shall comprehend.
As to the passage cited by Domat — In qua preesumptione sunt qui in quaque regione commorantur,” that is, the received -notions and circumstances of the place, &c. see Judge Cheves* opinion, already quoted in 2 Const. Deci. 96, which is also that of the court — “The issue of female slaves is in general to be considered as identified with the parents. From the nature ef the property, this principle (oí identificationJ is generally necessary to the perpetuation of the property; particularly in cases like the present.”
The words “general” and “generally” amount to the prcc-sumptio of the civil law, as cited by Domat. They serve also to let in Sir Samuel Romilly’s exception, when the issue was become a man; in which case neither the necessary preservation *138 of the property, nor the humanity (which Pothier relies upon, and which our law as well as equity courts will always consult) is at all concerned.
It is, not without diffidence, presumed that the case of Gayle and Cunningham was properly decided upon the foregoing principles of the civil law, and that the analogies derive-able 'from the common law are weak and unsatisfactory.
It seems clear also, from the authority of Sir ffm. Jones, of Chief Justsce Tilghman, of Judge Tucker, and of the able ■writer in the North American Review (Professor Everett) that the common law courts of England are much indebted to the civil law; and that their admiralty and ecclesiastical tribunals are still more so. In the various questions necessarily arising out of a state of slavery, as it exists in several of these United States, the common law furnishes very little light. The Code Noir of the French and Spanish, islands and settlements in the West Indies and in South America, is derived almost wholly from -the civil law. Domat, who is so frequently appealed to in all our courts, has extracted from the Corpus Juris Civilis as much as was necessary for his 'European countrymen; and h& would have left nothing unsaid upon the subject of slaves, con-, sidered as property, if slavery had existed in France. As it is* inany cases relative .to it have been decided by reference t& what he has collected as to the increase of animals; a deeper research into the materials from whence he formed his volumes,, would have shewii that the antients abhorred the idea of con-j "founding the human species with the brute creation. Humanity, Which from Tribonian to Pothier, constitutes so distinguishing a feature of their slave-law, could hardly he expected to occupy them on the subject of herds and floci.s. In short, it is matter of Infinite regret that no American Domat has as yet presented m our language, the provisions of a system that leaves to the zealous and acute enquirer little necessity for search in any other quarter. The present President of the Charleston College has given ample proof of his talents in this department of knowledge; and we may hope that the legislature of this state will, before it be too late, provide such inducement to call forth *139 bis industry and abilities, as may satisfy the profession of the law and the community who depend so much upon them.
When the question arose, a century ago, in Maryland, between the tenant for life of slaves, and the remainder man. Do mat alone was consulted. As he does not touch the subject of slaves, the Maryland lawyers suffered themselves to be governed by what is laid down in Domat, upon the subject of the increase of flocks and herds, which the civil law, as before observed, most carefully distinguishes from the partus ancilla•?. rum — the issue of female slaves. The error became 'communis„ and therefore fecit jus; so that when Mr. Dulaney, a man well read in the civil law, decided a similar case, after an interval of seventy years, he felt himself bound “stare decisis,” rather than to unsettle what was become, in Maryland, a rule of slave property. He did not, however, fail to comment on the blunder that had crept into the original decision; 1 Harris & M‘Henry, 160, ('Maryland Reports.) The North Carolina case referred to by Judge Gaillard, is in Cameron Norwood, 310. See. too Hen. & Munf. 290; Va. Rep. In addition to the testimonia in favor of the civil law, it cannot be amiss to add the following remarks of Mr. DuponceaU, of the Philadelphia bar, whose intimate knowledge of that system has been shewn in his various publications respecting it.
“ The common lawyer (in England) looks down upon the civil law with a mixed feeling of contempt and dislike; while the civilian, proud of the superior, elegance of Justinian’s collection, smiles at what he calls the barbarous jargon of Westminster Hall. Yet, those two systems though different in many respects, assimilate more than is generally believed; at any rate they are both, as they respectively apply, constituent parts of the general jurisprudence of the land. We have, in this respect, an immense advantage over the English nation; the administration of the civil and common law is committed to the same fudges, anddhe same body of jurists' is called upon to practice both. Hence it becomes necessary to our practitioner to become acquainted with the two codes; by which means the law jeriU become, in their bands, a more expanded and more liberad *140 science. The fruits of the study of the civil law,' which ímá lately become fashionable among us, are already perceptible is erudite works of jurisprudence, and in the able decisions of federal and state judges, who.have shewn by their examples, what advantages may be derived from an acquaintance with that beautiful system of moral philosophy applied to human affairs.”
As to the dislike of English common lawyers, to the civil-law, Mr. Duponceau makes the following just remarks
“ The source of that dislike lies deep in the history of tlieir country. The efforts made in former times to introduce the civil law into England, were with a view to destroy the liberties of that nation. The attachment of the (Roman Catholic) clergy, to the civil code, was not so much on account of its admirable theory of contracts, as of the imperial texts in favor of the unlimited authority of church and king, and the administration of justice without a jury; which plainly shewed what would have been the judicial organization of the kingdom, if their doctrines had prevailed.. Nor can we blame the English nation for entertaining the same jealousy at the present day, when we consider the tendency of monarchical governments to arbitrary power. In' this republican country, no such danger is to be dreaded; and our common lawyers may profit by a knowledgé of the civil law, without fearing the introduction of monarchical principles, or of any preference of the torture to the trial by jury.” — Du-ponceau’s Address to the Law Academy of Philadelphia, 1 Jour* nal of Jurisprudence, 217.
Judge Desaussure has; in the foregoing decree, reiied upon the following article of the code noir, by which the French islands were governed, and which was derived almost wholly from the civil law, where that law could apply:
“Ne pourront etre saisis et vendus separemment, le mari et lafemmeetleurs enfans impúberes, s’ils sont tous sous la pu-issance du meme maitre: declaróos nulle les saisies et ventes qui en seront faites; ce que nous voulons avoir lieu dans les alienations volontaires, sous peine contre Ies alienateurs d’etre, prives de celui ou de ceux qu’ils auront gardis, qui seront *141 adjuge’s aux acquireurs; sans quils soient tenus de faire aucuflr supplement du prix.—Code Noir des. Isles Francoises, Art. 47. Code Noir pour La Louisiane, Art. 23.
The expression, impúberes, shows with what propriety Sir Samuel Romilly, in the dictum already cited, distinguished between the slave when grown to manhood.
Both the above cases provide that the issue and increase born, during a tenancy for life or other temporary estate, shall go to the proprietor or remainder man.
For the benefit of such members of the bar as may not be familiar with French and Latin, the subjoined translations of what has been-cited from those languages, are added:
Ancilla cum natis, &c.
“If a female slave, with her issue, be bequeathed, (inasmuch as tbe doctrine of accession does not apply to the human species) the legacies are separate.”—Dig. cited 3 Poth, ad Pand. 315.
Si quis mirillas, &c.
If female slaves, with their issue, be bequeathed, the issue Will pass, though the mothers be dead. — Inst. 2, 20, 17.
Vinnius’ Commentary.
“In this, and the three following paragraphs, we learn What is the law if during the life of the testator, the thing bequeathed be diminished, or augmented. If it be diminished, the law is that the legacy is not thereby extinguished, unless that which has been taken away constitutes the principal, the remainder being merely accessory. Nor is the heir bound to supply the loss; he is only to deliver what remains. This is shown by four examples: 1. The legacy of a female slave, with her issue, (the case above stated from the digest:) 2. The case of ordinary and vicarial servants: 3. The legacy of a flock or herd: 4. The legacy of thepeculium of a slave. But, as I have already said, the remainder, (id quod superest) passes under the bequest, provided it be in its nature principal, and not merely accessory to the part lost: for if the lost .part be principal, the accessory is extinguished with it. This is evident from the example set forth in this paragraph, of the legacy of *142 ü slave with his psculium; or of a farm, with its furniture, utensils, Sic. In case oj augmentation, that increase goes also to the legatee;, of which three examples are-adduced: 1. The legacy of a flock or herd, to which many heads are added.* 2. Of a house to which columns and tablets of marble have been aiflxed: 3. Of a peculium which has subsequently become larger. But this class is very comprehensive (Hie locus late patet;) for herein are included fruits, interest of money (usurae,). hire of farms (pensiones preediorum,) the issue of slaves fpartus;) the increase of flocks and herds (fetus;) alluvion; an island suddenly appearing on the boundary of land (in confinio nata;) and many other instances, of which Justinian has not in this part of his code (hie) treated.” — Finn. id Supra.
“In infinitum,, quibusque primis, ,&c. 28. — See 2 Domat, 161,
“Nimirum, sic in universum jus est.”
■ “Doubtless, the general law is, that when a question arises as to the amount pf a legacy .(quantum sit in legato,) we regard the time wheri the Tega'hy becomes due. Accordingly, if before that time, the, thing" bequeathed has received any increase, (quovis modo auetum fuerit Jegatum,) even that increase shall pass (augmeptum illud legatoüo debetur,)
“ An ipstrüménti instrumentum, §*c.w
“ Where the furniture, stock, and other appendages of a farm, &C. haye been bequeathed, it is asked whether the appendages of those appendages (instrument! instrumentum) are included. For the. things provided for the comfort and accommodation of -servants on a farm (rusticorum) to wit, spinners, fullers, barbers, scullions, (focarije) are not the appendages of the land (agri ipstrumentum) but the appendages of .those appendages, that is, of the slave's who cultivate it.
My opinion is that all these pass, and w.ith them, their ■wives.and children, who, being employed on. the settlement, must be supposed to have been included .by the testator in his legacy of that settlement (eadem villa.) For he ought not to be supposed capable of willing a cruel separation of such objects*
“ Kon partus fructuaria, fyc.”
*143 The issue ought hot to go to the tenant for life, c? other limited term (home fidei possessori — mortgagee, &c.). But in other parts of the law, it is provided that the issue shall ht -considered as accessorial (in fructu, sive reditu, aut causa.)
“ Exemplnm afíert Scsevola, fee.”
Scsevola states the following case: A legacy to a concubine was in the following words: “ 1 give her my farm in the Appian road, with the farmer, his wife, and children." A question was made whether grandchildren passed. Scsevola answered that nothing prevented their passing with the rest.
Pothier adds, “ This construction of the word children arises from a desire to avoid the odious separation of children from mothers regularly, the term children was not extended tfe grandchildren.”
“ Ne pourront etre sa'Isis e'i vendns, &c.”
“ There shall be no seizure and sale, under execution, of husband, wife, and children not grown jjj^^iBjffifaeres) separately. All such sales shall be ^JjdShfoy private contract, under the penalty of forwrmi^-Cn the part 5f the seller, of such parts of a family as may retamvv^j(||iP^hall become the property of him who pura^j^hi^otners, wi®out hie being liable to pay any additional f rice.” Kffe’ I
The subjoined clause from tint air cggapletes the view deriveable from that system (den’vi^LSsa^íh'e civil law') on this interesting subject:
‘ Énjoignons anx gardiens, usu fru itiers, adiftodiateifrs, et autres jouissans des fonds auxquels Sont attaches des esclaves qui y travaillent, de gouverner les dits'esclaves comme bobs peres de families; saris quils soient tenus, apres leur administration, de rendre le‘prix de ceuxqui seront dccedes, on diminués paririaladie, viellesse,ou au’tramént, sansleur fautéjét sans quils puissent aussi reteñir, coinm'e fruits a leur profit, les enfáns tie's des dits esclaves, durant leur administration; lesquéls nous' voutons etre .conserves et rendus a ceux qui en seront les maitr'es and proprietaires Art. 54, du Code Noir des Isle's, 81; 49. duCodfe Noir de la Lousiane, 125.